Leonard C. EDWARDS, d/b/a Edwards Air Hose Bracket Company, Sapulpa, Oklahoma, Plaintiff,

v.

VELVAC, Inc., Waller Carson, H. R. Salter, 3530 West Pierce Street, Milwaukee, Wisconsin, Defendants.

Civ. A. 5764.

United States District Court
E. D. Wisconsin.

March 12, 1956.

Quarles, Spence & Quarles, Milwaukee, Wis., J. Preston Swecker, Washington, D. C., for plaintiff.

Irving A. Puchner, E. Eugene Kohls, Milwaukee, Wis., for defendants.

TEHAN, Chief Judge.

The complaint herein charges the individual and corporate defendants with infringement of plaintiff's Patent No. 2,554,176 and with unfair competition.

The patent in suit was issued May 22, 1951 upon an application filed July 12th, 1949, and covers a bracket having a looped coil spring depending from the arm thereof. The device is intended to be mounted on the rear of the cab of a tractor-trailer motor truck to support the air brake hoses which extend from the tractor to the trailer. The bracket, as shown in the patent, consists of a base comprising a curved plate intended to be secured to the roof and rear wall of a tractor cab, directly above the rear window thereof, a rearwardly extending horizon-

938

tally disposed arm fastened at its front to the upper portion of the base plate and carrying a looped spring at its rear end and a diagonal brace extending from the lower portion of the base plate to the arm, being secured to the arm near the outer end thereof. The hoses, by which the brake system of the trailer is connected with the tractor, are intended to be supported by the spring through which they are looped to keep them from being damaged by dragging on the tractor drive shaft and fifth wheel especially during jackknifing and sharp turns when the maximum length of the hoses is likely to be needed. In addition the bracket serves to keep the hoses from scuffing or chafing against the rear of the trailer cab and also to prevent their being smeared with grease from the fifth wheel which is usually covered with grease.

In addition to the base plate, arm and brace, the patent specifications and claims also define the bracket as having a pair of "body members" which are shown in the drawing as comprising pockets in the base plate wherein the front end portions of the arm and brace are received for securement to the base plate, through slits therein.

The defendants by their answers and amendments thereto have admitted the issuance of the patent to the plaintiff and that plaintiff is the owner thereof but deny the validity of said patent and the infringement thereof by the defendants. It is also denied that the defendants were guilty of unfair competition.

In determining the question of validity we will first consider defendants' contention that the patent in suit evidences no invention over the state of the art at and prior to the time the patentee Edwards entered it.

It appears without dispute that as far back as the early 1930's, operators of tractor-trailers were aware of the problem of keeping the air or vacuum hoses up off the fifth wheel and running gear structure, and yet providing for sufficient slack in the hoses to permit of turning and "jackknifing" and had adopted certain devices to solve the problem.

The commonest practice was to attach a clamp or clip directly to the center rear of the cab, either above or below the rear view mirror to which was fastened a spring through which the hose was looped. The plaintiff himself, who began operating heavy equipment back in 1930, so admitted, and identified in catalogue page exhibits, a hose suspension spring clip, a clamp, and a hose support bracket as typical devices for supporting a looped spring during those earlier years.

It appears that the employment of such devices as a clip, clamp or small bracket in conjunction with a spring, solved the problem of keeping the hose line free from the dangers of contact with the grease-filled fifth wheel and the running gear of the tractor, long before plaintiff filed his application for this patent.

However, it is urged by plaintiff that this method created or left unsolved certain objectionable features. The plaintiff points out that when the device of a clamp, clip or small bracket is affixed to the rear outside wall of the cab, the spring and hose depending therefrom are either in actual contact with the rear wall or extremely close to it, with the consequence that when the tractor is in motion the spring and hose would strike against the rear wall, chafing and scuffing it and causing annoyance to the driver.

Some time in 1949 the plaintiff recognized that if the point at which the spring was attached, were extended rearwardly some three, four or five inches from the vertical plane of the rear of the cab, the depending spring and hose would not come in contact with the cab. To achieve this result he designed a three piece bracket intended to be positioned on the curved surface of the top rear center of the tractor cab, and filed his application for patent thereon on July 12th, 1949. The patent in suit was granted on May 22, 1951.

The plaintiff claims that until his invention of the bracket device, there was no other type of equipment or device for supporting a hose except the clamp, clip and small bracket that he admitted were in common use theretofore. His claim in this respect is based upon his own experiences in observing other trucks and their equipment over a period of years, reaching back to 1930, during which years he drove at the rate of about 100,000 miles a year in the states of Colorado, Kansas, Oklahoma, Arkansas, Louisiana and Texas.

It may be that the plaintiff saw in his travels no types of equipment other than those admitted to and described by him, but we are persuaded by the testimony of other witnesses and the exhibits introduced through them that the state of the art was much more advanced than he claims.

There was introduced into evidence the depositions of some seven truck mechanics taken at Akron, Ohio, Evansville, Indiana, and Indianapolis, Indiana. These mechanics in each of these places, for the most part working independently and without knowledge of one another, had made and installed hose brackets for tractors, which served the same purpose as the patent in suit. These brackets, a number of which have been received in evidence, were made and put in public use from three to six years before the application was filed on the patent in suit. Their testimony showed that these men had made and installed a considerable number and variety of these hose brackets, differing from one another to a greater extent than some of them differed from the bracket in the patent in suit.

It appears without dispute that during the 1930's and 1940's, it was customary in the trucking industry for fleet owners to buy their tractors and trailers stripped. Their own truck mechanics did the work of mounting the fifth wheels, putting on the gas tanks, hooking up the vacuum or air hoses, and the like, it appearing that each fleet owner had his own uses and purposes to serve.

The evidence adduced through these depositions convinces the Court that for many years before plaintiff's application was filed on the patent in suit, a considerable number of variations of the basic structure of the bracket were well within the routine skills of the ordinary mechanic.

Objection has been made by the plaintiff to the receipt in evidence of the depositions of these truck mechanics, which were taken on November 9th, 10th and 11th, 1954, on the grounds that compliance was not made with the thirty-day notice provision contained in Section 282 of the New Patent Statute, Title 35 U.S.C., 1952.

"In actions involving the validity or infringement of a patent the party asserting invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before the trial, of the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit or, except in actions in the United States Court of Claims, as showing the state of the art, and the name and address of any person who may be relied upon as the prior inventor or as having prior knowledge of or as having previously used or offered for sale the invention of the patent in suit. In the absence of such notice proof of the said matters may not be made at the trial except on such terms as the court requires."

It appears to this Court that the objection must be overruled and the depositions received as proof on the basis of the pre-trial order entered in this matter under date of October 5, 1954.

The plaintiff herein had moved for a preliminary injunction, which the Court after hearing denied. In an effort, however, to be helpful, the Court advanced the case, and held a pre-trial conference on the 5th day of October, 1954. At that

time, the Court set down the trial for December 7th and 8th, 1954, and further ordered that:

"1. Not later than November 15, 1954, all amendments to pleadings and motions preliminary to trial will be filed, and all discovery procedure will be completed."

On November 2, 1954, the defendants gave the plaintiff notice that testimony would be taken on the 9th and 10th in Akron and Evansville, and on the 5th of November, they gave notice of the examinations to be held on November 11th at Indianapolis. The first examinations therefore were lacking one day, and the last examination three days, of the prescribed thirty-day notice.

It appears to this Court that the defendants, who had cooperated in the advancement of the case, and had accepted a limited period within which to complete their preparation, were entitled to rely on the time limit set forth in the pre-trial order, to complete their discovery procedure, no matter what defense it touched upon. If the plaintiff was aggrieved or felt prejudiced, he should have prayed for relief under the pre-trial order.

The plaintiff patentee is, of course, entitled to the presumption of validity, a principle long recognized in the case law and now set forth in the new Patent Act of 1952, U.S.Code, Title 35, Section 282, in the following language:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

The plaintiff contends that his patent was not granted merely on a conventional bracket but a bracket having a special structure for attachment to a vehicle to support an air hose. This patent is, he claims, a new combination, patentable as such, capable of being quickly and easily assembled by an ordinary mechanic and is a material improvement over any bracket known or in use heretofore.

Webster's Unabridged Dictionary defines a bracket as

"An overhanging member, simple or composite, projecting from a wall or pier or other body to support weight falling outside of the same * * *."

"*Bracket* is the general term for all projecting supports, whether a piece of projecting timber or stone, a triangular frame, or of some other form; * * *."

If not ancient, a bracket is at least old and venerable.

It is true that the claims of the patent include certain limitations by which we presume, the plaintiff hopes to distinguish his bracket from all other brackets, and especially the triangular frame mentioned in Webster's definition. These limitations comprise:

"A first body member projecting from said base;" and

"A second body member projecting from said base."

These projecting members provide for the attachment of the arm and brace to the face of the base above the top surface thereof away from the plane of the base. It is claimed that they have special utility in the construction and combination of elements inasmuch as they cooperate with the arm brace and base to provide a secure construction of unitary form which does not require the passage of the fastenings for these elements through the body of the base itself, with heads on the inside of the latter that would interfere with the smooth fitting of the base on the cab of the tractor. The particular form of the fastening means for attaching the arm and brace to the body member is not set out in the claims. It is admitted that the particular form of fastening is not of critical importance.

The significance of these "body members" has been made no clearer by the conflicting statements that plaintiff has made in his briefs. In his original pre-trial brief he states: "No claim of the

patent is limited to the outstruck body members as such illustrated in the drawings." In his pre-trial reply brief, however, he seemingly reverses himself and asserts, "Consequently, these components of the claims (body members) are important characteristics of the invention, are clearly defined in the specification and claims, and are material parts of the claimed invention."

The "spring members" or "spring support members" on the end of the bracket arm are of course old. A spring support is an obvious manner of holding something in such a way as to protect it from injury by sudden shocks and the state of the art in this particular case shows that it was commonly used in conjunction with an air hose for a long time.

■ It appears to this Court that plaintiff has combined a triangular bracket old in the art, and a spring old in the art, and the Court can take judicial notice that there is nothing about the device of the patent in suit which is not an old and recognized part of the fund of common knowledge and it appears that the presumption of validity to which these patents are entitled cannot prevail over the holding that the patent lacked invention over what was common knowledge. The Court therefore takes judicial notice of the invalidity of the patent for lack of novelty.

The choice of the several elements which comprise the alleged combination of each of the patent claims and their aggregation into the claimed device required only the ability of one skilled in the art.

The Court holds that the patent in suit evidences no invention over the state of the art at and prior to the time the patentee Edwards entered it. The Court will further observe that it would so hold had the evidence on the state of the art shown only the admitted custom of employing clips, clamps and small brackets in conjunction with springs.

It would further appear that the claims are invalid for aggregativeness.

■ Neither the bracket nor the spring member performs any new or different function in the claimed aggregation, and the whole is no more than the sum of its several parts.

"The combination, to be patentable, must produce a different force or effect, or result in the combined forces or processes, from that given by their separate parts. There must be a new result produced by their union; if not so, it is only an aggregation of separate elements. * * *."

Reckendorfer v. Faber, 92 U.S. 347, 357, 23 L.Ed. 719, 724.

■ This new result must be something more than "a mere aggregate of several results, each the result of one of the elements." Everlasting Furniture Brace Co. v. Wittliff, 7 Cir., 1930, 44 F. 2d 129, 130.

"* * * The test to be applied to such patents is that the combination must perform some new or different function—one that has unusual or surprising consequences." Photochart v. Photo Patrol, Inc., 9 Cir., 1951, 189 F.2d 625, 627–628.

We can perceive no unusual or surprising consequences from this union of bracket and spring. The bracket serves to perform its common and ordinary function of holding the object it supports out and away from its base, and the spring provides a flexible, yielding and shock-proof support to the hose.

For all the foregoing reasons we hold that the patent is invalid. We deem it unnecessary to consider other defenses raised in this respect.

We see no point in extended treatment of the issue of infringement. The accused device falls clearly within claim 3 if not 1 and 2 and consequently infringes.

A physical comparison of the accused device and patentee's hose support disclose that except in one respect they are substantially identical and clearly are

intended to be positioned and function in the very same manner.

The extent and nature of the one difference in the two hose brackets is perhaps best revealed in the words of defendants' patent counsel to whom a proposed model had been submitted for opinion and advice:

"There are two other ways that this bracket can be made which would avoid all other questions of infringement. One of these would be to entirely eliminate the two extrusions upon the arcuate body member to which one of the ends of the arm and bracket are secured. It seems to me that with the extrusion eliminated the said ends of the arms and bracket could be merely spot welded to the body member, or secured in some other fashion. This structure would definitely avoid the claims of the Edwards patent because each of said claims positively include as essential elements the two body members which are either the sockets 15 and 19 of the drawing or might be extruded portions of the model as more broadly covered in claim 3. Thus, if you omit elements of a claim which are positively recited therein, and which are essential elements in the claim, then you avoid infringement."

 Counsel's opinion notwithstanding, this Court holds that the accused device is an obvious infringement. What the United States Supreme Court said in the case of Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 855, 94 L. Ed. 1097, respecting infringement applies here:

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

"The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 15 How. 330, 14 L.Ed. 717, it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. 'To temper unsparing logic and prevent an infringer from stealing the benefit of the invention' a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30,

42, 50 S.Ct. 9, 13, 74 L.Ed. 147. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results, Imhaeuser v. Buerk, 101 U.S. 647, 655, 25 L.Ed. 945, although the area of equivalence may vary under the circumstances. See Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 414–415, 28 S.Ct. 748, 749, 52 L.Ed. 1122, and cases cited; Seymour v. Osborne, 11 Wall. 516, 556, 20 L.Ed. 33; Gould v. Rees, 15 Wall. 187, 192, 21 L.Ed. 39."

██ This rule as to infringement is also the established rule in this Circuit. Trager v. Crest Specialty, 7 Cir., 1950, 184 F.2d 577, 578:

"The test as to whether infringement exists is whether the accused device does the same work in the same way and accomplishes the same result as the patented device. Nordberg Mfg. Co. v. Woolery Mach. Co., 7 Cir., 79 F.2d 685."

Plaintiff's claim in respect to unfair competition on the part of the defendants is bottomed on these allegations of the complaint: Paragraph 10 charges violation of a confidential relationship with respect to plaintiff's customer lists and alleges that defendant "has supplied other Air Hose Brackets upon orders for Plaintiff's Air Hose Brackets"; Paragraph 11 charges that defendants were deceiving the public and plaintiff's customers into believing that they were dealing with the plaintiff and receiving plaintiff's products; and Paragraph 12 alleges that defendants' advertising is deceptively similar to plaintiff's "for the purpose of deceiving the said customers and the public." All of these charges are denied by the defendants.

For a better understanding of the issue we shall set forth the pertinent facts on the relationship and activities of the parties. The plaintiff, Leonard C. Edwards, started in the trucking business in 1930, and continued therein to the present, operating in his home state and five or six other states in that region. In January, 1950, he established the Edwards Air Hose Bracket Company in Sapulpa, Oklahoma, for the purpose of manufacturing and marketing his air hose bracket. He had no full-time salesmen and made his sales through manufacturers' agents or directly to three large truck manufacturers. These three companies, White Motor, International Harvester, and Fruehauf Trailer accounted for approximately two-thirds of his 1951 sales.

Velvac, Inc., of which defendants, Waller Carson and H. R. Salter were at the times material here, officers, directors and principal stockholders, was engaged in the business of marketing power brake parts, valves, chambers, cylinders and all the other parts having to do with controlling truck and trailer transportation by brakes, some of which products it also manufactured.

Velvac was incorporated here in Wisconsin in 1934, and Carson was an incorporator and treasurer. He states he was inactive in the company until about 1942 or 1943, when he went to Detroit to attempt to revive the company. He became president at that time, and moved the company to Milwaukee. The corporation was too small to hire full-time salesmen, so it handled its sales through some nine manufacturers' agents located in various sections of the country, each having certain defined territory. Each of these representatives also carried a number of other lines of products.

Velvac's sales operation consisted in supplying these representatives with catalogues, circulars and samples and dis-

plays, and relying on them to distribute them by mail or personal call to the distributors in their territory. It is expected in the trade that such representative will make a complete tour of his territory every three to four months, during which tour he will succeed in meeting his customers about 75% of the time and be able to win acceptance of the line on about 25% of the calls. Business resulting from such sales effort is not processed through these manufacturers' agents but goes directly in the form of orders to Velvac. Velvac fills the orders, and remits the commission to the representative in that particular territory. There were approximately 1400 distributors of its line in the country and Velvac did business with about 1000 of them through the efforts of its representatives.

Carson alternated with Salter on sales and administration. When Carson was on the road for a month or two of selling, Salter would perform the managerial function, and when Carson returned Salter took to the road. In addition, they formed and operated a manufacturers' agency under the name of Carson and Salter, until Salter moved to Chicago to establish his own business.

Although Carson learned of the Edwards Air Hose Bracket in early 1951, he had no relation with Edwards until later in December of that year. Carson states that the occasion of his meeting with Edwards resulted from a request from his Alabama representative to drop in on Edwards at Sapulpa if he were ever in the neighborhood and try to obtain the line for him.

The exact nature of the agreement arrived at by Edwards and Carson in December, 1951, is not entirely clear, but it appears that Velvac would purchase the Edwards Hose Bracket at the national distributors' price he sold White Motors, and would resell it at the dealer price of about 25% above the price at which the jobbers bought. In addition, Edwards agreed to and did appoint each of Velvac's nine representatives as his manufacturers' agent on sales of 100 units or more at his jobber price. Edwards was to supply catalogue sheets and other advertising material and Velvac and the agents were to distribute them and push the product. No agreement on the duration of the relationship was had. The Edwards contracts provided for commissions beginning on February 1st. The first shipment of brackets was received on February 15th.

In a letter acknowledging their receipt, Carson made the following suggestion:

"If you wish to write us the names of any manufacturing or other accounts in the Carson & Salter territory together with the names of the buyers in the present customers we will cover them as rapidly as we can. If any of them happen not to be on our present customer list we will see that their names are added. * * *."

Carson concluded with the observation that it would be to Edwards' advantage to supply the same type of information to his other representatives.

On February 19th, 1952, Edwards sent to Carson & Salter, Inc., a letter containing "a list of those who asked for information on our Air Hose Bracket." Thirty-six firms are listed together with the date Edwards supplied them with the information sought. No suggestion appears in the letter or in the testimony at the trial that any of these firms had ever made a purchase. It appears without contradiction from Carson's testimony at the trial that sixteen of the thirty-six were already Velvac customers, and except for one large distributor who was undesirable because of his resale practices, the balance should be classed as dealers with whom a manufacturers' agent does not deal except through a distributor.

Immediately upon his return in December, 1951, from the Sapulpa, Oklahoma contract conference, Carson wrote Edwards for 3000 catalogue sheets and among other things suggested

"We must have a 'part number' so it can go in our price list. We

have given it a number 55B–51 which places it with our related accessories. I suggest you use the same number on all your sales material, as it will help your sales if buyers can identify it easily. We have found it a help to the buyer to print the number to the left of the item name."

It appears without dispute that Edwards adopted the code number 55B–51, and caused it to be printed on his literature and packaging in comparatively small and inconspicuous type immediately to the left of the boldfaced word "Edwards".

While Carson knew that all Edwards' advertising material and packages shipped to Velvac bore the number 55B–51, he testified that he did not know until some time in October, 1952, and after Velvac had begun to market its own hose bracket under the code number 55B–51, that Edwards was using it on all his advertising material.

It is Carson's testimony that upon realizing that fact he took prompt steps to change the number, and at his attorney's suggestion that it be a substantial change, chose 58G 61. In support of his statement, he submitted a purchase order to his printer, dated November 13th, 1952, for 5000 catalogue sheets to carry the new and corrected number. Later he caused the color used in the circular to be changed from red, the color employed by Edwards, to orange. While the dates on which these changes occurred have not been established precisely, it would appear that they were made and at a time reasonably close to that mentioned.

Our extended and labored statement can be concluded by a recital of these remaining facts. On April 1st, 1952, Edwards gave notice to all nine manufacturers' agents that their selling arrangements would be cancelled April 15, 1952. In a letter to Carson he expressed regret for the action and stated he had no faith in the use of factory agents in the first place. He offered Carson-Salter and at

least one other, a three months' extension and said in the same letter that he was pleased with his dealings with Velvac.

The agents thus precipitously released, protested vehemently to Carson by letter and phone that they had been taken advantage of in that they had had only about two months to introduce the Edwards Bracket to the market and that now Edwards would profit from the substantial efforts they had put in during February and March.

Carson testified that Edwards' abrupt cancellation created ill will and theatened the existence of Velvac's fine sales organization. It was the desire to provide its agents with a sales product to replace Edwards bracket that caused Velvac to devise and manufacture the accused device.

The action in unfair competition has in our opinion no merit. The unfairness consists, according to the complaint and plaintiff's briefs, of alleged violation of a confidential relationship with respect to plaintiff's customer list and of deception practised upon plaintiff's customers and the public by the use by defendants of the plaintiff's code number 55B–51, and the identical red color used by plaintiff in his advertising.

In respect of alleged misuse of the so-called "confidential" customers' list, the Court finds: (1) That the list was submitted to Carson & Salter, Inc. and not to Velvac or Carson personally. (2) There is no suggestion expressed or implied that the list was valuable or confidential. (3) It was not a list of plaintiff's customers, but merely an enumeration of firms who had made inquiries, principally about price. (4) If it be held that the list was available to Velvac through Carson & Salter, Inc., which we do, it has not been established that either used the list after the contractual relationships between them and the plaintiff was broken off. And, (5) It appears that if Velvac did have the use of the list it had no value, since sixteen of thirty-six firms named were already customers, and

of the remainder all but one, were dealers who could not be directly contacted by Velvac.

In failing to submit a proposed finding on this point and omitting any reference to it in his two post-trial briefs, we believe the plaintiff anticipated the finding that this Court now makes that there is no evidence of an unfair practice with respect to the use of so-called customers' list.

This then leaves for discussion only the matter of alleged deception by means of the use on defendants' literature of plaintiff's code number and "his" color, red.

We believe that the following language from Dodge Bros. v. East, D.C. E.D.N.Y.1925, 8 F.2d 872, 877–878, sets out the applicable standards to be met:

"Summing up the whole matter it seems to me that, when plaintiff claims the public has been deceived, or is reasonably likely to be deceived, by the advertising of defendant, such deception must rest on proof that defendant has appropriated something peculiarly belonging to plaintiff, and associated in the public's mind, by reason of expenditure of money and wide, continuous, and uniform advertising, with plaintiff's business."

Nothing is clearer than the fact that 55B–51 was created by the defendant Velvac alone and that each of the components thereof had a fixed significance in relation to the types of equipment carried in their catalogue. It is true that defendant Velvac urged plaintiff to use it on all his printing, but I find no evidence suggesting that Velvac surrendered its rights to the code number to plaintiff. In our mind Velvac's right to the use of 55B–51 was as good or better than plaintiff's.

It does not appear then that "defendant has appropriated something peculiarly belonging to plaintiff." In respect of the further test of Dodge Bros. v. East, supra, that that which is appropriated be "associated in the public's mind, by reason of the expenditure of money and wide, continuous, and uniform advertising, with plaintiff's business", the plaintiff fails utterly. One has only to observe the insignificant treatment given to the code number on plaintiff's literature to conclude that it was not intended to be a substantive means of association in the public's mind with plaintiff's product.

The literature put out by both Edwards and Velvac both feature their firm names in large bold lettering as against the small print used for the code number. It seems fantastic to believe that any one could overlook the featured name and be confused or misled by the code number.

What was said in International Heating Co. v. Oliver Oil Gas B. & M. Co., 8 Cir., 1923, 288 F. 708, 711, 30 A.L.R. 611, is applicable here:

"* * * Unfair competition begins where imitation results in the deception of the customers of the party complaining. In this case, the customers of plaintiff were those who read its advertisements, and who made inquiry through the mails with the view of becoming agents for the sale of plaintiff's burners or purchasers for personal use. In every advertisement found in the record, each party made prominent its name and address, as well as the distinctive name of its burner * * *. But a customer obtained through an advertisement must of necessity read the advertisement to become acquainted with the article advertised and to know the name and address of the advertiser. * * No sensible person acquainted with plaintiff's advertisements would believe that the defendant company was advertising and selling plaintiff's burner."

We find under the circumstance here present, there was no confusion in the public's or customers' minds nor the likelihood for it.

The plaintiff submitted in evidence six letters as being "typical" reactions of his customers. Four of them were com-

plaints that Velvac was underselling Edwards' product, a matter here not material, one inquired why a spring was not enclosed with the bracket (Velvac so marketed) and the remaining one expressed a preference for a bracket that did not have a spot welded bolt. Such a showing falls far short of making out confusion or the likelihood thereof.

The incidence of identity of a very common color, in advertising or packaging in the absence of a showing of appropriation of features of a substantial nature peculiarly plaintiff's own, seems to be too insubstantial to warrant comment.

For the reasons stated, we hold that the defendants were not guilty of unfair competition with the plaintiff.

On motion of the plaintiff the complaint as to the defendant, H. R. Salter has heretofore been dismissed.

In respect to the other personal defendant, the Court finds that the plaintiff has failed to prove a state of facts which would justify a holding against Waller Carson in his individual capacity.